# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# KANSAS CITY

| | |
|---|---|
| JOHN T. GALLOWAY, Individually, and on behalf of a class, | ) ) ) |
| Plaintiff, | ) Case No. 11-CV-1020-DGK ) |
| v. | ) ) |
| THE KANSAS CITY LANDSMEN LLC, ET AL., | ) ) ) |

## DEFENDANTS' FURTHER STATUS REPORT AND REPLY IN SUPPORT OF MOTION FOR FINAL SETTLEMENT APPROVAL

Plaintiffs' counsel has objected to final settlement, claiming that a website issue may have potentially interfered with class members' ability to seek exclusion or file objections, and therefore, the defendants should pay another $200,000 to re-notice the class and further delay the start of the redemption period. The defendants respond as follows:

**A.    What actually happened?**

1. The settlement agreement that the parties ***JOINTLY*** agreed to and filed refers to www. ***noticeclass***.com/GallowaySettlement.

On January 18, 2013, the parties filed motions for preliminary class certification. [Docket Nos. 45, 47.] The motions attached their Settlement Agreement. [Docket No. 45 at Ex. 3; Docket No. 47-1.] The Settlement Agreement stated that certain settlement-related documents would be posted on a website at www.***noticeclass.***com/GallowaySettlement. [Docket 45, Ex. 3 at ¶ 12(b); Docket 47-1 at ¶ 12(b).]   Attached as Exhibit A is the relevant page from the Settlement Agreement, which shows the agreed-upon website address.

Importantly, and as stated in the Defendants' prior status report, the website is a "passive" website.  It contains information about the settlement but is not like the "active" type

website envisioned by the originally-proposed claims-made settlement, which would have required class members to utilize the active website to submit information as a predicate to obtaining a coupon. ***Put simply, the postcard is the coupon—the website at issue is there simply as a back-up informational source.*** Attached as Exhibit B is a print out of the website's homepage, which demonstrates facially that this is a passive website.

2. The postcard that the parties **JOINTLY** agreed to and filed, and that the Court ordered be mailed, refers to www.*classnotice*.com/ GallowaySettlement.

On November 14, 2013, the Court preliminarily approved the settlement class and ordered that the defendants mail out over 725,000 postcards advising class members that certain settlement-related documents are posted at a website at www.*classnotice*.com/ GallowaySettlement ("Preliminary Approval Order"). [Docket No. 65, Ex. 1.] Attached is the relevant page from the Preliminary Approval Order, which shows the website identified on an attachment to the Preliminary Approval Order.

3. The Defendants complied fully with the Settlement Agreement and the Court's Preliminary Approval Order.

Those two websites addresses mentioned above are different—the first being at ***noticeclass***.com (which the parties agreed to in the settlement agreement) [Docket No. 45 at Ex. 3; Docket No. 47-1—*see* Exhibit A] and the second being at ***classnotice***.com (which the parties agreed to and the Court attached to its preliminary-approval order). [Docket No. 65, Ex. 1—*see* Exhibit C] The mix-up occurred during some revisions to the form of the postcard made in October 2013. Importantly, neither party initially caught the error prior to its submission to the Court, ***including plaintiffs' counsel who reviewed the postcard prior to its submission to the***

***Court***. Attached as Exhibit D is correspondence from plaintiff's counsel showing their review of the postcard that failed to identify the inconsistency with the Settlement Agreement.[1]

Thus, the parties jointly submitted the postcard with the error, and on November 14, 2013, the Court issued the Preliminary Approval Order, [Docket No. 65], which, in effect, required the defendants to (a) launch the website at www.***noticeclass***.com/GallowaySettlement [Docket 45, Ex. 3 at 12(b); Docket 47-1 at 12(b)], and (b) mail out the postcards instructing the class members to visit a website at www.***classnotice***.com/GallowaySettlement. [Docket No. 65-1.]

On November 27, 2013, and as agreed to by the parties, the defendants launched the website at www.***noticeclass***.com/GallowaySettlement, which contained the settlement materials that the class members could read. [Docket No. 77-1.] Plaintiffs' counsel, although they had involvement in the editing of the postcard, had no involvement in the work regarding the launch of the website, nor did they express an interest in such involvement.

On November 29, 2013, and as ordered by the Court, the defendants mailed over 725,000 postcards containing the website address www.***classnotice***.com/GallowaySettlement. [Docket

---

[1] As attached Exhibit D demonstrates, plaintiffs' counsel reviewed the postcard, offered edits, but did not catch the error. Here are some relevant portions of the e-mail exchanges between plaintiffs' and defendants' counsel.

> Plaintiffs' Counsel – October 30, 2013, 11:10 a.m. – "I have not reviewed the exhibits again, but assuming they haven't changed substantively since the last version we submitted, that is fine."
>
> Defendants' Counsel – October 30, 2013, 11:17 a.m. – "We made a number of changes to the exhibits (the postcard and the class notice that will appear on the website). I'm not sure what you would call 'substantive,' but we did modify both exhibits quite [a] bit . . .."
>
> Plaintiffs' Counsel – October 30, 2013, 12:13 p.m. – "I am fine with the overall new structure and look of the notices. I caught a few small things that may be worth changing before you file. I think the correct spelling is 'Kansas City Landsmen' rather than 'Landmen' – it says 'Landmen' in the caption on the front of the postcard."

(Ex. A.) Although Plaintiffs' counsel spotted errors like the one above, they apparently did not catch the error in the website address.

No. 77-3.] Plaintiffs' counsel, although they had involvement in the editing of the postcard, had no involvement in the mailing process, nor did they express an interest in such involvement.

Importantly, on both occasions described above, the defendants did **_exactly_** what they agreed to do in the Settlement Agreement and **_exactly_** what they were ordered to do by the Court in the Preliminary Approval Order.

4. The Defendants learned of the error and corrected it.

The postcards were mailed out late on a Friday night via standard-mail delivery (as opposed to the speedier first-class delivery). [Docket No. 77-1.] On the Monday morning following (*i.e.*, well before the delivery of any of the postcards), which was December 2, the defendants spotted the inconsistency between the website on the approved Settlement Agreement and the approved postcard. The solution, however, seemed simple enough. The defendants immediately contacted www.*classnotice*.com and instructed the website to forward all traffic from www.*classnotice*.com/GallowaySettlement to www.*noticeclass*.com/GallowaySettlement. [Docket No. 77-2.]

5. The Defendants, when faced with the website issue, quickly resolved it.

At first, the solution seemed to work. From December 2 through December 9, the defendants made sure the traffic forwarding was working (it appeared to be from their end) and heard nothing from any website managers, class members, or plaintiffs' counsel. On the morning of December 10, however, the administrator of www.classnotice.com advised the defendants that it received an e-mail from a class member stating that www.classnotice.com/GallowaySettlement was not working. That did not make sense either to the administrator or the defendants, since they were, in fact, still able to log onto that website and view the settlement materials. For about 36 hours, the class administrator received about eight more notices from class members regarding the same issue, as it struggled to determine why some class members were able to log

on while others were not. This suggests that the bulk of the postcards must have begun arriving no sooner than December 9, since there was no communication before then, and then a series of e-mails between December 10 and December 12.

On the morning of December 12, the administrator of www.classnotice.com figured out what was happening and immediately fixed the problem. Apparently, users who typed www.classnotice.com/gallowaysettlement, with lower-case "g" and a lower-case "s," were successfully redirected to www.noticeclass.com/GallowaySettlement, but those who typed the same address with a capital "G" and a capital "S," were not. That was the issue.

This was fixed on the morning of December 12, about 36 hours after the first class members raised the issue, about a month before the deadline for objections, about a month and a half before the deadline for exclusions, and close to three months before the anticipated start of the redemption period. [Docket No. 77-3.]

**B.      Did a "grave due process violation" occur, as plaintiffs' counsel contends?**

The Federal Rules do not require perfect notice. They require only the "best notice that is practicable under the circumstances." FED. R. CIV. P. 23. As described below, this standard was met and therefore, there was no due-process violation, let alone a "grave" one requiring the expenditure of another $200,000 (the costs incurred by the defendants for mailing over 725,000 postcards) and weeks or months of further delay to start the redemption period.

   1.      <u>Plaintiffs' counsel did not claim a due-process violation through one-day newspaper and store notice.</u>

Plaintiffs' counsel originally asked the Court to approve a claims-made settlement where full notice would be published in newspapers only once on a weekday and in certain stores. [Docket No. 37-5 at ¶10-c.] What if class members did not buy the papers or did not walk into the stores? This was not a question raised by plaintiffs' counsel—the same plaintiffs' counsel

who now complain about a grave due process violation over a website issue. The issue was, however, raised by the Court and was one reason the Court denied the initial settlement. [Docket No. 38 at 10.]

    2.    <u>The preliminary approval recognizes that no due-process failure occurred even when six-percent of the class never would receive notice in the first place.</u>

In denying the claims-made settlement, the Court instructed that notice should, if possible, occur through direct means. [Docket No. 38 at 10.] On January 18, 2013, plaintiffs' counsel filed a motion to approve a settlement that would, as the Court instructed, require the defendants to directly mail postcards to the class members—or at least to those class members whose addresses were known to the parties. [Docket No. 47-1 at ¶ 12(a).]

On February 5, 2013, the Court—noting that not all class member addresses were known to the parties—specifically asked the parties how many of the approximate 770,000 class members would have postcards mailed to them. [Docket No. 51 at 2.] In response, the parties advised that the mailing would be to about 726,000 of the 777,000 class members. [Docket No. 52 at 2; *see also* Docket No. 77-4.] In other words, the plaintiffs' counsel, and ultimately the Court, found no due process violations with a direct mailing that would ***not*** go to ***over 43,000 class members***. Why not? Because a direct mailing to what amounts to about 94% of the class is, in fact, the best notice practicable under the circumstances.

    3.    <u>A few dozen class members not able to get onto a website for a brief period of time is not a due process violation, let alone a grave one.</u>

As set forth in the defendants' status report, the website listed on the postcard, at its high point, received about 50 – 100 hits a day. The standard-delivery postcards apparently did not begin arriving in earnest until December 9 or later, since that is when the class members began e-mailing the website manager about the problem. The problem was fixed by the morning of December 12.

So, the notion that no due-process violation occurred when over 43,000 members of the class never received notice in the first place, but that a "grave" due-process violation occurred when a few dozen class members might have had problems logging onto the informational website for about 36 hours, is simply nonsensical.

**C.     What about those seeking exclusion?**

Plaintiffs' counsel raises concerns about class members seeking exclusion. This is a red herring.

> 1.     <u>Even during the period when the website experienced problems, class members were seeking exclusion.</u>

Some class members were, in fact, seeking exclusion even during the time of the website issue. [Docket No. 77-4.] How is that possible? Because these class members—like the defendants and the website manager—were typing in the website address with all lower-case letters.

> 2.     <u>The issue was fixed a month and a half before the exclusion deadline.</u>

The issue was fixed on December 12. [Docket No. 77-2.] Exclusions were permitted until January 30, 2014 [Docket No. 65 at 4]—meaning that those seeking exclusions had another six weeks to get onto the website, read about the process, and submit exclusions. A number of class members did just that. [Docket No. 77-4 and 77-5.] A few of those seeking exclusion even specifically mentioned their disdain for plaintiffs' counsel receiving fees in this lawsuit. [Docket No. 77-5.][2]

---

[2] Here are a few quotes from those exclusions:

> *"The cause behind the premise of the lawsuit is probably a mistake on the part of the company, and in any case has not caused me any financial loss or personal problem.*

**D. What about objectors?**

Plaintiffs' counsel also raises concerns about class members making objections. This, too, is disingenuous.

  1. <u>Plaintiffs' counsel presents a wild hypothetical.</u>

In order to object to the settlement, a class member would need to review the process on the website, then write a letter setting forth the reasons for the objection, and then mail three copies of the letter—one to each of the Court, plaintiffs' counsel, and defense counsel. [Docket No. 65-2 at 5-6.] Plaintiffs' counsel postulates that during the brief period when the website had problems, a potential objector who was previously motivated and upset enough about the settlement to write the objection letter and send it to three sources, somehow instantly lost the motivation after being made to check back a day or two after experiencing the problem. That is just silly.

  2. <u>The Court has vetted and will continue to vet the settlement.</u>

The Court did not rubber-stamp an unfair settlement. On the absolute contrary, the Court twice denied settlements, and even after accepting a third version preliminarily, requested further

---

*The whole notion of this lawsuit and the lawyers who are bringing it is a sad reflection on the current state of the US legal system. This lawsuit is a clear example of the excess and abuses of the courts simply to provide income to the representing lawyers.*

*I will not be part of Spence Fane Britt & Browne earning $175,000 so that I can get a $10 coupon for a car rental."*

      —Gary Jacobson, Westford, MA[2] [Docket No. 77-5 at 2.]

*"Class Action lawsuits only benefit the attorney firm that initiates them and I want no part of one."*

      —Zoran Mladen, Golden, CO[2] [Docket No. 77-5 at 3.]

*"In my opinion, this lawsuit epitomizes frivolous lawsuits and the participation of trial lawyers and all other attorneys there, and I refuse to be party to such."*

      —Greta Perleberg, Wichita, KS [Docket No. 77-5 at 4.]

changes to the postcard and notice. The Court is therefore well aware of the pros and cons of the settlement and has been zealously protecting the class and keeping its interest in the forefront.

On January 15, 2014, one class member filed an objection on a variety of grounds, including whether "the settlement stands in stark contrast to the attorney fees to be paid to counsel for the class members." [*Id*.] At the final fairness hearing, the Court will consider this class member's objection and any other issues the Court *sua sponte* raises.

Plaintiffs' counsel suggests that the Court will **_not_** make the right decision, (notwithstanding the Court's prior consideration of the class settlement and forthcoming consideration of the objection on file), without the benefit of a few more objections. This, too, is a tortured argument.

**E. Conclusion.**

Class notice is never perfect. But written notice is the best form of notice possible. Indeed, the Court granted preliminary approval knowing that over 43,000 class members would never receive notice. The fact that after mailing out over 725,000 postcards, the website had a brief problems is, from a notice perspective, as *de minimus* as can be. This is especially so, since the website is for informational purposes only, had minimal traffic even at its high point, had an alternate way for class members to receive the information (by entering lower-case letters in the web address, e-mailing the class administrator at www.classnotice.com, or sending a letter to the postcard administrator at the return address), was corrected within 36 hours of the first notice of the problem, and was corrected well before the deadlines for exclusions and objections (and months before the start of the redemption period).

As the defendants noted in a prior filing, it is axiomatic that websites do not always run perfectly. On January 24, 2014, this Court's own websites experienced a temporary outage. But in this day and age, everybody knows that if a website is not functioning, and if the website is

important to the user, then that user knows to try the website again later. Nobody needs another postcard to tell them that bit of common sense, especially at the cost of another $200,000 and a delay of redemption for another several months. This case has gone on for a long time, and it is now at the point when the Court should, with or without or without a final approval hearing, grant final approval and permit the redemption period to begin. [Docket No. 65 at 3 (Court's Preliminary Approval Order stating that "The Court may dispense with the Final Approval Hearing and approve the Settlement Agreement . . . without any further notice to Class Members.").]

Respectfully submitted,

*/s/ Scott K. Logan*

Scott K. Logan, Mo. Bar #40381
LOGAN LOGAN & WATSON, L.L.C.
8340 Mission Road, Suite 106
Prairie Village, KS 66206
T: (913) 381-1121
F: (913) 381-6546
slogan@loganlaw.com

-and-

Ronald M. Gaswirth, TX# 07752000
(admitted *pro hac vice*)
Barry M. Golden, TX# 24002149
(admitted *pro hac vice*)
GARDERE WYNNE SEWELL LLP
1601 Elm St., Suite 3000
Dallas, Texas 75214
(214) 999-4746
FAX (214) 999-3746
E-mail: rgaswirth@gardere.com
E-mail: bgolden@gardere.com

**Attorneys for Defendants**

**Certificate of Service**

I certify that on February 6, 2014, a copy of the foregoing was electronically filed on the CM/ECF system, which will automatically serve a Notice of Electronic Filing on the following:

Brian J. Christiansen
Bryant T. Lamer
Kyle B. Russell
Spencer Fane Britt & Browne LLP
9401 Indian Creek Parkway, Suite 700
Overland Park, Kansas 66210

*s/ Scott K. Logan*
Attorney for Defendants

Gardere01 - 6412148v.9